UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KATRINA DIXON,                     )        CASE NO.  3:11-CV-482
                                   )
                Plaintiff,         )
                                   )        MAGISTRATE JUDGE MCHARGH
        v.                         )
                                   )
COMMISSIONER OF SOCIAL             )        <u>**MEMORANDUM OPINION & ORDER**</u>
SECURITY ADMINISTRATION,           )
                                   )
                Defendant.

This case is before the undersigned pursuant to the consent of the parties.  (Doc. 19).  The issue before the Court is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff Katrina Dixon's application for Supplemental Security Income benefits under title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., is supported by substantial evidence, and therefore, conclusive.

For the reasons set for the below, the Court AFFIRMS the decision of the Commissioner.

## I. <u>INTRODUCTION & PROCEDURAL HISTORY</u>[1]

On May 31, 2006, Plaintiff Katrina Dixon ("Plaintiff" or "Dixon") protectively applied for Supplemental Security Income alleging that she became disabled on April 17, 2006 due to suffering from seizures.  (Tr. 70, 130-32, 143).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 72-74, 80-82).  Thereafter, Plaintiff requested a hearing to contest the denial of her application for benefits.  (Tr. 88-89).  The Social Security Administration granted Dixon's request and scheduled a hearing before an administrative law judge.  (Tr. 90-91).

---

[1] The Court's citations to the administrative record refer to the Supplemental Transcript, (Doc. 13).

On June 2, 2009, Administrative Law Judge Stephen C. Fulton (the "ALJ") convened a hearing via video to evaluate Plaintiff's application.  (Tr. 19-49).  The ALJ presided over the hearing from Boston, Massachusetts, and Plaintiff along with her attorney, appeared in Toledo, Ohio.  (Tr. 10).  Plaintiff's cousin, Mr. James Mann, also testified during the proceeding.  (Tr. 39-43)  Additionally, vocational expert, Ms. Amy Kutschbach (the "VE"), testified before the ALJ.  (Tr. 44-47).

On August 26, 2009, the ALJ issued his unfavorable decision in which he applied the five-step sequential analysis,[2] and concluded that Plaintiff retained the ability to perform her past relevant work, and thus, was not disabled.  (Tr. 10-18).  Following this ruling, Plaintiff sought review of the ALJ's decision from the Appeals Council.  (Tr. 6).  But, the council denied Plaintiff's request thereby making the ALJ's decision the final decision of the Commissioner.

---

[2]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability".  *See* 20 C.F.R. § 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity – i.e., working for profit – she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

(Tr. 1-3).  Dixon now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Dixon, born on July 29, 1969, was 39 years old on the date of her hearing before the ALJ. (Tr. 43).  Accordingly, at all relevant times, she was deemed a "younger person" for Social Security purposes.  20 C.F.R. § 416.963(c).  Plaintiff graduated from high school, (Tr. 23), and has past experience working as a housekeeper, food service employee, busser, day care provider, greeter and laundry worker.  (Tr. 23-27).

## II.  MEDICAL EVIDENCE

Plaintiff asserted disability primarily due to her seizure episodes.  Because her attacks of the ALJ's decision center upon the evidence related to her seizure and mental disorders, the Court constrained its recitation of the record evidence herein to that portion of the evidence.  However, the undersigned reviewed all of the evidence presented by the parties in reaching its decision.

Plaintiff's problems with seizures date back to 2002.  In August of that year, Plaintiff was diagnosed with "pseudo-seizures secondary to anxiety and/or depression."  (Tr. 383).  Through the years Plaintiff continued to complain of seizures and/or shaking throughout her body.  *See* (Tr. 247-48, 255-56).  Plaintiff was treated by a neurologist, Dr. Imran Ali.  Sometime on or after March 2, 2006, Dr. Ali completed a "Basic Medical" form for the Ohio Department of Job and Family Services on Plaintiff's behalf.  (Tr. 376-77).  In the report, Dr. Ali indicated that Dixon suffered from a seizure disorder based upon electroencephalogram ("EEG") testing.  (Tr. 376).  He assessed her health status as being "poor but stable" and opined that she would be unemployable for more than a year.  (Tr. 376-77).

3

On September 7, 2007, Plaintiff presented to Dr. Karen Robie, a psychologist, for a consultative examination.  (Tr. 258-61).  Dixon informed Dr. Robie that she experienced about two seizures each day and that they prevented her from working.  (Tr. 258).  Dixon also complained of pounding headaches.  (*Id*.).   With regard to daily activities, Plaintiff indicated that she went to the store almost every day, and could cook, do laundry and take care of her hygiene without any difficulty.  (Tr. 259).  Dr. Robie described Plaintiff's affect as tearful and somewhat flat during the examination, and noted that Plaintiff was alert, but not oriented.  (Tr. 260).  Ultimately, Dr. Robie diagnosed Dixon with depression NOS, seizures of an unknown etiology, and various social, occupational and economic problems.  (Tr. 261).  Additionally, Dr. Robie opined that Dixon was mildly impaired in her ability to relate to others and understand and follow instructions, and moderately impaired in her ability to maintain attention to complete simple, repetitive tasks and withstand the stress and pressures of day to day work.  (Tr. 261).  Dr. Robie commented that Dixon's mental health prognosis "appeared to be fair" and that Dixon "seem[ed] to be looking for a health explanation as to what may be an emotional problem." (*Id*.).

On October 5, 2006, state agency physician, Dr. Tonnie Hoyle, conducted a review of Plaintiff's medical record and assessed Dixon's mental residual functional capacity.  (Tr. 269-85).  Dr. Hoyle evaluated Plaintiff in 20 areas of mental functioning.  (*Id.*).  The doctor concluded that Plaintiff was "not significantly limited" in the following areas: remembering locations and work-like procedures; understanding and remembering very short and simple instructions, carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or

4

proximity to others without being distracted by them; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (*Id.*).  However, Dr. Hoyle rated Plaintiff as "moderately limited" in the following six areas: completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. (*Id.*).

Dr. Hoyle also reviewed Dr. Robie's findings and considered them in evaluating Plaintiff's mental status.  (Tr. 271).  The doctor noted that Plaintiff's statements regarding the severity of her symptoms were not completely reflected in the record.  (*Id.*).  Dr. Hoyle also commented that Dixon often changed the information she provided, observing that Dixon gave inconsistent accounts of the frequency of her seizures.  (*Id.*).  Notably, Dr. Hoyle concluded that the credibility of Dixon's statements was "highly questionable."  (*Id.*).  On March 28, 2007, state agency physician, Dr. Irma Johnston, reviewed Dr. Hoyle's assessment and affirmed it as written.  (Tr. 367-68).

Plaintiff began treatment with her psychologist, Dr. John Wryobeck in October 2006. (Tr. 362).  Dr. Wryobeck noted that Plaintiff was referred to him by Dr. Ali.  (Tr. 329).  His

treatment records indicate that Plaintiff exhibited behaviors consistent with depression and that Plaintiff initially denied needing mental health treatment.  (*Id*.). When Plaintiff met with Dr. Wryobeck in November 2006, he mentioned that he wanted to "[e]xplore the possibility of a trial of anti-depressant to help with [her] mood," however, Plaintiff stated that she was not ready to consider using medication.  (Tr. 343).

On or around December 20, 2006, Dr. Ali completed another Basic Medical form.  (Tr. 374-75).  In it, he noted that Dixon suffered from non-epileptic seizures and partial seizure disorder.  (Tr. 374).  Dr. Ali commented that Plaintiff experienced approximately three to four seizure episodes each month, and that Plaintiff experienced incontinence with her last seizure. (*Id*.).  He also commented that Dixon was following up with him every three to six months as needed.  (*Id*.).  Additionally, Dr. Ali noted that Plaintiff's physical functional capacity was affected during her seizures.  (Tr. 375).

Dixon presented back to Dr. Wryobeck in February 2007.  (Tr. 362).  She continued to complain of seizures.  (Tr. 363).  Dr. Wryobeck diagnosed her with major depression, recurrent type, and dysthymia. (*Id*.).  He also noted that Plaintiff had recently agreed to undergo psychiatric evaluation for purposes of getting trial medication.  (*Id*.).  During Plaintiff's visit with Dr. Wryobeck she acknowledged that she was under a significant amount of stress, but was doubtful that it could be the sole cause of her seizures.  (Tr. 344).  Nonetheless, Dixon agreed to learn how to better manage and cope with her stress.  (*Id*.).

On April 30, 2008, Plaintiff presented to Dr. Ali.  (Tr. 370-73).  Dr. Ali noted that Plaintiff continued to complain of experiencing seizures multiple times each week with no improvement in frequency.  (Tr. 370).  The doctor also mentioned that Dixon had difficulty

sleeping and may have suffered from other underlying stressors.  (*Id*.).  Dr. Ali advised Plaintiff to return to her psychiatrist regarding her non-epileptic seizures.  (Tr. 371).

In April 2009, Dixon presented back to Dr. Wryobeck.  (Tr. 490).  His treatment notes reveal that Plaintiff's mood was low and that she appeared more lethargic than during her prior appointment.  (*Id*.).  Dr. Wryobeck also noted that Dixon still "struggle[d] with the idea of taking medication" for her problems.  (*Id*.).  Plaintiff next saw Dr. Wryobeck in May 2009.  (Tr. 380-81).  The doctor noted that Dixon suffered from major depression, dysthymic disorder with symptoms of anhedonia and hypersomnia, and alexithymia.  He opined that Dixon's psychiatric problems impaired her ability to maintain sustained concentration and to complete a normal workday or workweek. (*Id*.).  Dr. Wryobeck further noted that Plaintiff's social interactions and adaptability were limited and affected her employability.  (Tr. 381).  In his opinion, Plaintiff was not be able to make rational decisions even under moderate emotional distress, and would have had difficulty sustaining employment.  (*Id*.).  Dr. Wryobeck opined that Dixon had marked limitations in the following areas: keeping a regular work schedule and maintaining punctual attendance; interacting appropriately with others; withstanding the stresses and pressures of routine simple unskilled work; and making judgments that are commensurate with the functions of unskilled work.  (Tr. 379).  However, he found that Plaintiff was no more than moderately limited in her ability to: remember, understand and follow simple directions, maintain attention and concentration for two hour periods of time; and perform work activities at a reasonable pace.

## III.  <u>ALJ'S RULING</u>

The ALJ made the following findings of fact and conclusions of law in his application of the five-step evaluation process.  At step one, the ALJ found that Dixon had not engaged in substantial gainful activity since the date she protectively filed her application for benefits on

7

May 31, 2006.  (Tr. 12).  At step two, the ALJ held that Plaintiff's depression, anxiety and conversion disorder were all severe impairments.  (Tr. 12-13).  But, at step three, the ALJ ruled that none of these impairments, individually or combined, met or equaled one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-14).

Before moving to the next step, the ALJ assessed Dixon's residual functional capacity ("RFC") to work.  (*Id*.).  The ALJ concluded that Plaintiff retained the ability to perform the physical demands of work of at each of the three exertional levels.  (Tr. 14-15).  However, the ALJ noted that Dixon could only perform occasional climbing, and that she could not perform any climbing which involved the use of ropes, ladders or scaffolds.  The ALJ also found that Dixon would need to avoid all hazards.  (*Id*.).  With regard to Plaintiff's mental capacity to work, the ALJ indicated that Plaintiff could understand and remember simple instructions, maintain concentration for two hour periods, interact appropriately with coworkers and supervisors, and adapt to changes in a work setting.  (Tr. 15).  Based upon these findings, at the fourth step in the evaluation process, the ALJ held that Plaintiff retained the RFC to return to her prior work as a food service worker, greeter, housekeeper, laundry worker or busser.  (Tr. 17).  Accordingly he held that Dixon was not disabled.

## IV.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

8

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981)*.*  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed*. Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)*; Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983)*.*  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387*.*  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989)*.*

## VI.  ANALYSIS

Dixon has asserted four objections to the ALJ's decision.  First, Plaintiff submits that the ALJ erred at step three of his analysis when he failed to consider whether Dixon's seizure disorder medically equaled a listing.  Second, Dixon maintains that the ALJ's finding at step four

was flawed because her past work activity never rose to the level of substantial gainful activity. Next, Dixon objects to the ALJ's stated rationale in assessing her RFC arguing that it did not meet the standards of the treating source doctrine. Finally, Plaintiff attacks the ALJ's decision by arguing that the ALJ failed to evaluate the opinion of her treating psychologist in evaluating her mental RFC. Each of these arguments are addressed below.

### A. ALJ's Finding At Step Three

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3).

A claimant will be deemed disabled if her impairment(s) meet or equal one of these listings. In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). However, if the claimant does not meet all of the listing's requirements, she may still be deemed disabled if her impairments "medically equal" the listing. 20 C.F.R. § 416.926(b)(3). To do so, the claimant must show that her impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R § 416.926(a).

Because Dixon asserted disability based upon her problems with seizures, the ALJ analyzed whether she met or equaled Listing 11.02 or 11.03 for epilepsy. Listing 11.02 details

the listing requirements for convulsive epilepsy and Listing 11.03 details the same for nonconvulsive epilepsy.  20 C.F.R. Pt. 404, Sbpt. P., App. 1, §§ 11.02, 11.03.  At the outset of his analysis, the ALJ indicated that he did not find Dixon's impairments to meet or medically equal either listing.  The ALJ ruled that Plaintiff did not meet either listing because she was not diagnosed with epilepsy, but was rather diagnosed with non-epileptic spells.  However, the ALJ's discussion did not explicitly address why he concluded that Plaintiff did not medically equal either listing.  Plaintiff contends that this failure constitutes reversible error.

The Court notes that this is not a situation in which the ALJ completely ignored the issue of medical equivalency necessitating remand.  Because the ALJ initially stated that Dixon neither met nor equaled Listing 11.02 or 11.03, it is fair to assume that the explanation he provided was intended to explain both parts of his decision.  Although the ALJ's discussion of the issue only consisted of a single explanatory sentence centered on whether Dixon *met* either listing, the explanation provided was sufficient to also justify the ALJ's conclusion that Dixon did not medically equal either listing.  As noted by the Commissioner, both this Court and another court in this Circuit have upheld the Commissioner's denial of benefits where an ALJ ruled that the claimant's pseudo-seizure impairment did not *medically equal* Listing 11.02 or 11.03.  *See Mann v. Astrue*, No. 1:10-CV-255, 2011 WL 2784566, at *7-8 (N.D. Ohio July 15, 2011) (*Mann* involved a child disability case); *see also Coleman v. Astrue*, No. 3:05-389, 2010 WL 28567, at *13 (M.D.Tenn. Jan. 5, 2010).  Thus, Plaintiff's diagnosis of non-epileptic spells not only precluded her from meeting Listing 11.02 and 11.03, but also reasonably precluded her from medically equaling either listing also.  The undersigned is satisfied that the ALJ considered *both* whether Dixon met or equaled either of the relevant listings, and finds that the explanation provided was sufficient to justify the ALJ's ruling on the question of medical equivalency.

11

On the other hand, even if the Court were to conclude that the ALJ's omission here was legally incorrect, the error was harmless. First, the ALJ's preliminary ruling that Dixon's impairments did not medically equal Listing 11.02 or 11.03 tends to evidence that the ALJ at least *considered* the issue of medical equivalency. But, more importantly, aside from that the Court notes that Plaintiff did not point to any evidence in the record demonstrating that her impairments medically equaled either listing at issue. Neither did Plaintiff directly argue that her impairments *actually* equaled either listing. As a result, the undersigned cannot see how the ALJ's ruling injured Plaintiff.

## B.  Medical Opinion Evidence

Next, Plaintiff asserts a number of arguments attacking the ALJ's treatment and consideration of the opinions offered by her treating physician, Dr. Imran Ali and treating psychologist, Dr. John Wryobeck. It is well-recognized that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule" is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 416.927(c)(2).[3] The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and

---

[3] Effective March 26, 2012, Sections 404.1527 and 416.927 of the Code of Federal Regulations were amended. Paragraph (d) of each section was redesignated as paragraph (c). *See* 77 F.R. 10651-01, 2011 WL 7404303.

(2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

When a treating source's opinion is not entitled to controlling weight under this framework, the ALJ must determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. 20 C.F.R. § 416.927(c)(1)-(6). These factors include: the length of the treatment relationship, the nature and extent of the treatment, how well the physician's opinions are supported by other medical evidence, the extent to which the physician's opinions are consistent with the record as a whole, whether the physician is an expert in the particular field of practice for which he/she is treating the claimant, and any other factor which may support or contradict the opinion. *Id.* The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions. *Id.* An ALJ's failure to adhere to this doctrine may necessitate remand. *Wilson*, 378 F.3d at 545.

However, an adjudicator's failure to adhere to the treating source rule will not always warrant remand. *Wilson*, 378 F.3d at 547. A violation of the rule may be deemed harmless where (1) the treating source's opinion is patently deficient; (2) the Commissioner makes findings consistent with the doctor's opinion; or (3) the ALJ satisfies the goal of the "good reasons" requirement despite failing to adhere to the letter of the regulation. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (*quoting Wilson*, 378 F.3d at 547). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Id.*

1. Dr. Imran Ali

13

Dixon asserts that the ALJ erroneously omitted any mention of Dr. Ali's findings within his decision.  The key findings of Dr. Ali which Plaintiff points to are contained within the Basic Medical forms Dr. Ali completed for the Ohio Department of Job and Family Services.  In the forms, Dr. Ali indicated that Dixon suffered from non-epileptic seizures which started in 2000.  He also indicated this condition affected Plaintiff's physical capacity to function during a seizure.  Finally, Dr. Ali opined that these seizures rendered Plaintiff unemployable for a period of 12 or more months.

While it is true that the ALJ did not make specific mention of Dr. Ali's findings within his written opinion, the ALJ did not entirely ignore the doctor's opinions.  As the Commissioner correctly notes, twice in his opinion, the ALJ referenced the Basic Medical forms completed by Dr Ali by their exhibit number, "20F".  The ALJ's first reference to exhibit 20F noted that Plaintiff was diagnosed with non-epileptic seizures based upon the results of EEG testing.  The ALJ next referenced this exhibit during his discussion of Plaintiff's RFC.

Plaintiff contends that the ALJ's references to exhibit 20F were not sufficient to demonstrate that the ALJ recognized that Dr. Ali penned the information contained within the exhibit.  The undersigned is not persuaded by Plaintiff's argument.  As the judicial officer evaluating Dixon's application for benefits the ALJ had the responsibility to review all of the evidence in the record before him.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (*citing Loral Defense Systems-Akron v. N.L.R.B.*, 200 F. 3d 453 (6th Cir. 1999)). This Court will not question the competency of the ALJ's review of the record unless presented with evidence sufficient to show a meaningful oversight or error by the ALJ.  Plaintiff has failed to present such.  Conjecture is not enough.  Exhibit 20F is an eight-page document, four of which patently state Dr. Ali's name as the author of the document.  Accordingly, the Court finds that

the ALJ's reference to the exhibit is sufficient to show that the ALJ was aware that Dr. Ali penned the records in question.

Nevertheless, the Commissioner concedes that the ALJ did not directly address the weight he assigned to Dr. Ali's findings.  Because the treating source doctrine requires an ALJ to identify the weight assigned to the opinions of the claimant's treating source, the ALJ's failure to do so here clearly violated this rule.  Thus, the ultimate question presented is whether this failure necessitates remand.  The undersigned concludes that it does not.

In the instant case, the ALJ's error was harmless because he met the goal of the treating source rule even though he did not comply with its requirements. Although the ALJ did not discuss Dr. Ali's opinion individually, the ALJ did provide a general statement of his overall view of the medical opinion evidence in the record.  The ALJ stated that the opinion evidence did not "contain any opinions from treating or examining physicians which identif[ied] any subjective or objective medical findings to support a conclusion indicating that the claimant [wa]s disabled or even ha[d] limitations greater than those determined."  (Tr. 16).  This explanation, while not specifically directed at any particular physician's finding, is adequate to justify the ALJ's treatment of Dr. Ali's opinion.

Dr. Ali's opinion contained two central findings: 1) the doctor's conclusion that Dixon's capacity to physically function was affected during seizures; and 2) Dr. Ali's opinion that seizures rendered Dixon unemployable for period of 12 or more months.   With regard to Dr. Ali's finding on Plaintiff's physical functionality, the Commissioner highlighted that the doctor's opinion was explicitly framed in terms of Dixon's abilities *during* a seizure episode.

The undersigned agrees with the Commissioner that Dr. Ali's finding regarding Plaintiff's physical abilities *during* a seizure was only of limited import because it focused solely

15

upon Dixon's ability while she was experiencing a seizure.  But, the relative importance of Plaintiff's abilities during a seizure is inherently based upon how frequently Dixon experienced seizure episodes.  During the hearing, Dixon testified that she suffered from one or two seizures a day about once a week.  She also testified that her seizures prevented her from engaging in any type of activity.  Although ALJ did not explicitly opine about the veracity of Plaintiff's statements regarding the frequency of her seizures, Dr. Tonnie Hoyle's findings directly undermined Dixon's assertions.  Dr. Hoyle noted that Plaintiff never gave consistent reports regarding the frequency of her seizures and found Dixon's statements to be incredible. Additionally, the ALJ did not credit Plaintiff's testimony about the severity of her seizures because her daily activities (i.e. watching television all day, shopping, banking, remembering when and what medications to take and when to attend therapy, knowing how to use public transportation, cleaning her house thoroughly on a daily basis, and preparing meals for her children) belied her account of her limitations and the effects of her seizures.  Since the ALJ did not believe Plaintiff's statements regarding her seizures, Dr. Ali's findings regarding Plaintiff's capacity *during* a seizure did not carry much value.  Accordingly, the ALJ's general statement that the opinion evidence in the record "d[id] not contain . . . any subjective or objective medical findings to support . . .  that the claimant [wa]s disabled or even ha[d] limitations greater than those determined" was an adequate explanation of why the ALJ did not credit Dr. Ali's findings.

Additionally, it is important to note that Dr. Ali's finding that Dixon was "unemployable" was not entitled to any deference.  Only *medical opinions* are entitled to deference.  *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010).  Opinions on issues reserved to the Commissioner – such as whether the claimant is employable — are not medical opinions, nor deserving of any particular weight.  *Id*.  Admittedly, the ALJ should have announced this

16

principle and confronted Dr. Ali's statement accordingly, however, his failure to do so does not undermine the fact that this portion of Dr. Ali's opinion was not controlling or entitled to deference.

Though the ALJ did not address Dr. Ali's opinion independently, the ALJ's written decision acknowledged the doctor's opinion and provided *some* basis for his rejection of the same. The ALJ's decision also manifests that he considered Plaintiff's testimony regarding the impact her seizures had upon her ability to function, and his decision to reject Plaintiff's statements is supported by the record. As such, the undersigned finds that the broad statement the ALJ offered of his view of the opinion evidence reasonably accounted for his treatment of Dr. Ali's opinion, and met the goal of the treating source rule though the ALJ failed to comply with the terms of the regulation. Therefore, the ALJ's failure to adhere to the treating physician doctrine was harmless.

### B.  Dr. John Wryobeck

Plaintiff next argues that the ALJ's RFC assessment did not appropriately account for all of her mental limitations because she is more mentally limited than the ALJ found. In support of this argument, Dixon maintains that the ALJ did not properly analyze the findings offered by her treating psychologist, Dr. John Wryobeck. Plaintiff notes that Dr. Wryobeck indicated that she had marked limitations in her ability to: 1) keep a regular work schedule and maintain punctual attendance; 2) interact appropriately with others; 3) withstand the stresses and pressures of routine simple unskilled work; and 4) make judgments that are commensurate with the functions of unskilled work. Dixon further notes that Dr. Wryobeck opined that her mental capacity to maintain attention and concentration for two hours and to perform work activities at a reasonable pace were moderately limited.

The ALJ assigned "little weight" to Dr. Wryobeck's opinions ruling that they were "out of proportion to and inconsistent with the treatment records." (Tr. 16). The ALJ also found that Dr. Wryobeck's opinion was not consistent with "what one would expect if the claimant were disabled". (*Id*.). Dixon argues that the ALJ's evaluation of Dr. Wryobeck's opinion fell short of what was required according to the treating source doctrine and that the ALJ's rejection of Dr. Wryobeck's conclusions were almost entirely based upon the ALJ's lay opinion of the medical evidence.

The ALJ's evaluation of Dr. Wryobeck's opinion is supported by substantial evidence as a reasonable person could find that the ALJ's decision to discount Dr. Wryobeck's opinion was sound. In order to be deserving of controlling weight, a treating source's opinion must both be supported and consistent with the other evidence in the record. *Wilson*, 378 F.3d at 544. In this case, the ALJ determined that Dr. Wryobeck's findings were inconsistent with Dixon's treatment records. For example, the Commissioner highlighted that in May 2009, Dr. Wryobeck's notes indicated that he had discussed the benefits of working with Dixon; whereas just two months later, Dr. Wryobeck stated that he believed Dixon would have "difficulty sustaining regular employment" and had marked impairments in several areas of mental functioning related to employment. (Tr. 379-81). Though Dr. Wryobeck's treatment note did not indicate whether the employment Plaintiff sought was part-time or full-time, the doctor's encouragement of Dixon to seek *any* type of employment was telling. At a minimum, the doctor's notation that Plaintiff was entirely unemployable was incongruous with his relatively recent former belief that Plaintiff could work to some degree.

Dr. Wryobeck's findings also conflicted with Dr. Tonnie Hoyle's assessment of Dixon's mental functioning capacity. In contrast to Dr. Wryobeck's marked findings, Dr. Hoyle opined

18

that Plaintiff was "not significantly limited" in her ability to make simple work decisions, maintain regular work attendance, and interact appropriately with the public and coworkers. Thus, the ALJ reasonably concluded that Dr. Wryobeck's opinion was not entitled to controlling weight because it was inconsistent with other evidence in the record.

Nevertheless, Dixon contends that even if the ALJ reasonably determined that Dr. Wryobeck's opinion was not entitled to controlling weight, the ALJ erred by failing to address the factors denoted in 20 C.F.R. § 416.927(c)(2) in explaining the weight he attributed to the doctor's opinion. But, Dixon has not identified, and the Court is unaware of, any binding case law demanding an ALJ to specify how he analyzed each of these factors individually. The regulations only require the ALJ to provide "'good reasons . . . for the weight . . . given to the treating source's opinion' –not an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (alterations in original). The "good reasons" requirement only demands the ALJ to *consider* the factors provided in 20 C.F.R. § 416.927. *Blanchard v. Comm'r of Soc. Sec.*, No. 11-cv-12595, 2012 WL 1453970, at *16-17 (E.D.Mich. Mar. 16, 2012), *R&R adopted* 2012 WL 1432589. While including a thorough assessment of each factor might be helpful in assisting a claimant to better understand the ALJ's decision, so long as the ALJ's opinion clearly conveys why the doctor's opinion was credited or rejected, the ALJ has satisfied his burden. *Francis*, 414 F. App'x at 804.

In the case *sub judice*, the ALJ's opinion offered both the claimant and the Court a sufficient understanding of why the ALJ assigned little weight to Dr. Wryobeck's opinion. In addition to noting that the doctor's opinions were inconsistent with other treatment records in evidence, the ALJ also explained that 1) Dr. Wryobeck's opinion was out of proportion to and inconsistent with Dixon's treatment records; 2) the doctor's course of treatment with Plaintiff

19

was not what one would expect if Plaintiff were truly disabled; and 3) there were no subjective or objective medical findings showing that Plaintiff was more limited than what the ALJ found. These reasons demonstrate that the ALJ evaluated the doctor's opinion with the necessary factors in mind, particularly, the nature and extent of the treatment relationship, the consistency of the opinion with the record as a whole, and the supportability of the doctor's opinion.

Of the reasons provided by the ALJ, Plaintiff only attacked them on one other ground. Dixon suggests that it was not appropriate for the ALJ to substitute his own lay opinion for that of Dr. Wryobeck.  It is correct, that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by medical evidence."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (*quoting Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006)).  Yet, the ALJ reserves the right to decide certain pertinent issues, such as the claimant's credibility, RFC, and employability. Furthermore, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (internal citations omitted).

The ALJ did not improperly supplant Dr. Wryobeck's opinion when he determined that the doctor's findings were only deserving of little weight.  The record contained medical opinions from other doctors who offered evidence that conflicted with Dr. Wryobeck's recommendations.  As a result, the Court cannot say that the ALJ's negative view of Dr. Wryobeck's opinion was based upon his lay opinion.  To the contrary, contradictory *medical* evidence existed in the record, upon which to support the ALJ's assessment of Dr. Wryobeck's opinion.

However, the Court acknowledges that the ALJ's statement criticizing Dr. Wryobeck's course of treatment, characterizing it as not "what one would expect if the claimant were disabled" is a close call.  Certainly, the ALJ is not a medical professional trained to independently evaluate a particular course of treatment chosen by one's health care provider.  Upon the Court's review of the record, it did not discover any medical opinion evidence indicating that Dr. Wryobeck's course of treatment was not indicative of a person suffering from a disabling condition. However, the Commissioner highlighted that Dr. Wryobeck's conclusions neglected to account for the numerous times he advised Plaintiff about the benefits of taking psychotropic medications to help manage her symptoms.  The record shows that Dr. Wryobeck talked to Plaintiff about taking medication on several occasions, but that Dixon declined to have the medication prescribed for her.  Based on a consideration of these records, a reasonable person could conclude that Dr. Wryobeck's findings were undermined by the fact that there was medication that the doctor felt could help Plaintiff.  As a result, the ALJ's criticisms of Dr. Wryobeck's ultimate findings and his treatment of Dixon are not without any support.

Additionally, no purpose would be served by remanding this case to demand the ALJ to further explain why he rejected Dr. Wryobeck's findings.  *Cf.  Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *see also Kornecky*, 167 F. App'x at 507-08.  Even viewing the doctor's opinion in a light most favorable to Plaintiff, Dr. Wryobeck never explicitly opined that he believed Plaintiff to be unemployable.  Though such a finding would not have been controlling upon the ALJ, the lack of such was probative of Dr. Wryobeck's view of Plaintiff's mental state.  It is telling that Dr. Wryobeck concluded that Dixon would have "difficulty

21

sustaining regular employment" rather than that she was precluded from working at all.  (Tr. 381).  While the ALJ could have better detailed his reasons for rejecting Dr. Wryobeck's opinions, the reasons provided were sufficient to justify his treatment of the doctor's opinion as the record as a whole supports the ALJ's decision.  The fact that there might also be evidence in the record supporting the opposite conclusion is immaterial.  *Francis*, 414 F. App'x at 805.

Next, Dixon maintains that the ALJ's RFC was not supported by substantial evidence because he did not properly account for the opinions of consultative examiner, Dr. Karen Robie, or state agency psychologist, Dr. Tonnie Hoyle.  Plaintiff contends that while the ALJ claimed to assign "significant weight" to the opinion of Dr. Karen Robie, the ALJ failed to account for Dr. Robie's finding that Dixon was moderately impaired in her ability to maintain attention and withstand the stress and pressures associated with day-to-day work.  Plaintiff insists that the ALJ's RFC, which only limited Plaintiff to "simple tasks" did not address Plaintiff's stress tolerance or attention limitation.

Plaintiff's argument does not merit remand.  Dixon essentially maintains that because the ALJ gave Dr. Robie's opinions significant weight, the ALJ should have adopted all of Dr. Robie's findings.  This assertion goes too far.  The ALJ did not state that he assigned full weight to Dr. Robie's opinion.  Had he done so, Plaintiff's argument might be more persuasive.  Instead, the ALJ only attributed significant weight to the doctor's findings after reviewing the entire record.

With regard to Plaintiff's problems with maintaining attention, the Court finds that the ALJ did sufficiently incorporate Dr. Robie's moderate notation into his RFC assessment.  Dr. Robie opined that Dixon's ability to maintain attention to perform simple, repetitive tasks was moderately impaired.  State agency psychologist, Dr. Hoyle also indicted that Plaintiff had a

22

moderate limitation in this area, but Dr. Hoyle's evaluation specified that Plaintiff was limited in maintaining attention *for extended periods*.  In his RFC, the ALJ held that Dixon only retained "the ability to concentrate for 2 hour periods over an 8 hour day on simple tasks".  (Tr. 15).  This limitation adequately accounted for Plaintiff's moderate limitation in attention noted by both Dr. Robie and Dr. Hoyle.

Similarly, the ALJ's omission of Dr. Robie's finding on Plaintiff's ability to tolerate stress does not warrant remand.  Though Dr. Robie opined that Plaintiff had a moderate limitation in this area, the doctor ultimately concluded that Dixon's mental health prognosis was fair.  At no point did Dr. Robie suggest that Plaintiff's stress tolerance completely precluded her from being able to work.   Additionally, neither of the state agency psychologists who reviewed the record mentioned that Plaintiff suffered from a moderate impairment with stress tolerance. Given that the ALJ did not intend to give full weight to Dr. Robie's opinion, it was reasonable for the ALJ to omit this factor from his RFC assessment in light of the evidence in the record detracting from this portion of Dr. Robie's opinion.

Lastly, Plaintiff contends that the ALJ erred because he did not address the assessment offered by Dr. Hoyle, the state agency psychologist.  Relying upon Social Security Ruling 96-6p, Dixon notes that ALJs are directed to consider and address opinions from state agency consultants in their opinion.  *See* 96-6p.  Plaintiff highlights that Dr. Hoyle opined that she had moderate limitations in several areas of mental functioning in the Mental RFC Assessment ("MRFCA") form the doctor completed.  However, this argument is also unavailing.

The ALJ did not specifically comment on Dr. Hoyle's findings, but his failure to do so posed no harm to Dixon.  Though Dr. Hoyle opined that Plaintiff suffered from a marked limitation in 6 out of the 20 areas of mental functioning considered by the doctor, these findings

were noted within Section I of the MRFCA form.  Section I of the form was titled "Summary Conclusions."  This Court has previously determined that an ALJ is not obligated to include a doctor's findings contained within Section I of the MRFCA in the ALJ's RFC assessment.  *Velez v. Comm'r of Soc. Sec.*, No. 1:09-CV-0715, 2010 WL 1487599, at *6 (N.D.Ohio Mar. 26, 2010) ("In general . . . the ALJ is not required to include the findings in Section I in formulating residual functional capacity.")  *R&R adopted* 2010 WL 1487729; *see Earls v. Comm'r of Soc. Sec.*, No. 1:09-CV-1465, 2011 WL 3652435, at *5 (N.D.Ohio Aug. 19, 2011).  Section I of the MRFCA is "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**."  POMS DI 24510.060(B)(2)(a)  (available at  https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060) (emphasis in original).  Section III of the MRFCA, titled "Functional Capacity Assessment" is the "**actual mental RFC assessment** . . . explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings."  *Id.* at (B)(4)(a) (emphasis in original).  As a consequence, there was no requirement that the ALJ incorporate the moderate limitations identified in Section I of the MRFCA into his assessment of Dixon's RFC.  In Section III of the RFC, Dr. Hoyle noted that Plaintiff often changed the information she provided to her physicians and was never consistent in her reports of the frequency of her seizures, causing Dr. Hoyle to conclude that Dixon's credibility was "highly questionable."  (Tr. 271).  Thus, despite the ALJ's failure to directly address Dr. Hoyle's opinion, the ALJ's RFC reasonably reflected Dr. Hoyle's findings.

## C. Plaintiff's Past Relevant Work

Dixon's final challenge to the Commissioner's denial of her application for benefits centers on the ALJ's ruling that she could return to her past relevant work.  A claimant will be

24

deemed disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A claimant's previous work is examined in terms of the individual's "past relevant work."  Past relevant work is defined as "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R § 416.960(b)(1).  There is a presumption that employment between January 1990 and June 1999 constitutes as "substantial gainful employment" where the claimant's monthly earnings averaged $500.00.  *See* 20 C.F.R. § 416.974(B)(2)(i).

Plaintiff maintains that none of her prior employment constitutes as past relevant work under the governing regulations.  Plaintiff asserts that between 1987 and 2004 she worked at 16 different jobs.  She further contends that in her best year of earnings, 1997, her average monthly income was $419.00, which fell below the regulations' recognized average monthly income of $500 for substantial gainful activity for 1997.  As a result, Dixon maintains that it was improper for the ALJ to find that she could return to her past relevant work at step four, because Plaintiff's former work did not meet this definition.

The Court rejects Plaintiff's challenges to the ALJ's ruling at step four of the sequential analysis.  To begin, the undersigned finds that Dixon has not presented evidence sufficient to demonstrate that none of her prior employment constituted "substantial gainful activity".  The record supports Plaintiff's assertion that her highest year of earnings was reported in 1997, totaling $5,024.08, but not Dixon's calculations.  Dixon divided this number by 12 in an attempt to show that her average monthly earnings for 1997 would have estimated to $419.00.  However,

Plaintiff did not offer any evidence to support the assumption in her calculation that she worked all 12 months in 1997. Plaintiff seems to suggest that her average monthly income is necessarily defined as her total annual income divided by 12 months, regardless of the actual number of months she worked. But this interpretation of 20 C.F.R. § 416.974a(a) is not consistent with the language used in the regulation itself. The regulation states that the claimant's earnings "will be averaged *over the entire period of work*", 20 C.F.R. § 416.974a(a) (emphasis added), not that the earnings would be averaged over the entire year. While it does not appear that the Sixth Circuit has been presented with this issue, the Eighth Circuit has addressed it and ruled thusly. *See Anderson v. Heckler*, 726 F.2d 455, 457 (8th Cir. 1984) ("The plaintiff's method of averaging her wages received during a calendar year over all the months in that year, whether plaintiff was employed during those months or not, circumvents the purpose for determining whether an applicant engaged in substantial gainful activity.").

In documents submitted to the Social Security Administration, Dixon indicated that she worked roughly five hours a day for six days a week as a greeter and cleaner for a restaurant between 1993 and 2004. She estimated her salary there to be $7.00 an hour. She also reported working seven hours a day for five days a week as a housekeeper at a motel between 1990 and 2001. Dixon indicated that she earned $5.00 an hour in this position. Based on these estimates, Plaintiff would have earned approximately $840.00 or $700.00 monthly, respectively in these positions—meaning that either of these positions would have constituted as substantial gainful employment under 20 C.F.R. § 416.974(B)(2)(i).

Although the record is silent as to how many months Dixon worked in 1997, Dixon cannot now try to exploit any deficiency in the record by arguing that her monthly earnings should be averaged over all 12 months of 1997. Plaintiff has not identified any regulation

26

imposing a duty on the ALJ to inquire into such detail.  The regulation which Plaintiff cites to as creating this duty, 20 C.F.R. § 404.1565(b), does not stand for this proposition.  This regulation states that *under certain circumstances* the adjudicator will ask the claimant about work the claimant has performed in the past.  20 C.F.R. § 404.1565(b).  But, it does not demand the ALJ to inquire about the months in which Plaintiff worked throughout a given year.  It is the claimant who carries the burden at the first four steps of the sequential evaluation process.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Thus, it was Plaintiff's duty to show that her prior work did not constitute as substantial gainful activity, and that she could not return to her past relevant work.  Plaintiff also suggests that the ALJ should have inquired to whether Plaintiff's former jobs were performed on a full-time or part-time basis.  Yet, this argument is immaterial because the regulations define "substantial gainful activity" as including part-time work.  20 C.F.R. § 416.972(a) ("Your work may be substantial even if it is done on a part-time basis…").  Therefore, the ALJ's finding that Plaintiff's prior work constituted substantial gainful activity is supported by substantial evidence.

Finally, the Court finds that the vocational expert's testimony was sufficient to support the ALJ's ruling at step four.  Although the ALJ was not required to solicit testimony from the VE to reach his decision at this step of the analysis, *see* 20 C.F.R. § 416.960(b)(2); *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010), the ALJ nonetheless posed a hypothetical question to the VE inquiring whether Dixon could still perform her prior jobs.  The VE testified that Plaintiff would be able to perform all of her former jobs, except that of a daycare worker.  Though Dixon argues that the VE's testimony was not sufficient to carry the ALJ's finding because the VE did not testify to whether these positions existed in significant numbers in the national economy, the Supreme Court has found that this showing is not required.

In *Barnhart v. Thomas*, 540 U.S. 20, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003), the court ruled that it was permissible for the Social Security Administration to find a claimant to be not disabled "where she remain[ed] physically and mentally able to do her previous work, *without investigating whether that work exist[ed] in significant numbers in the national economy*." (emphasis added).  As a consequence, the VE's testimony is adequate support for the ALJ's ruling that Dixon could return to her prior work as a food service worker, housekeeping cleaner, greeter, laundry worker and busser, even though the VE did not testify to whether these positions existed in significant numbers in the national economy.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  July 10, 2012.